## IN THE UNITED STATES DISTRICT COURT
## FOR THE  MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

THE CINCINNATI INDEMNITY                    CASE NO:
COMPANY,

     Plaintiff,

v.

OMG REALTY, LLC, JENNIFER
COUTURE, RALPH GARRAMONE,
M.D. FACS and DANESH NOSHIRVAN,

     Defendants.

_____/

### COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff The Cincinnati Indemnity Company ("Cincinnati" or "Plaintiff"),

by counsel, files this Complaint for Declaratory Judgment seeking a declaration of

rights and obligations, and states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      This is an action for declaratory judgment and for such further relief

as may be necessary or proper, pursuant to 28 U.S.C. § 2201 and Federal Rule of

Civil Procedure 57, to declare the rights, status and legal relations of Cincinnati

and Defendants OMG Realty, LLC ("OMG"), Jennifer Couture ("Couture"), Ralph

Garramone, M.D. FACS ("Garramone") and Danesh Noshirvan ("Noshirvan")

under insurance policies issued by Cincinnati to OMG.

2.      Jurisdiction is based on diversity of citizenship and is proper in this Court under 28 U.S.C. § 1332 (diversity of citizenship of the parties and amount in controversy, excluding interests and costs, in excess of the jurisdictional amount), as the amount in controversy exceeds $75,000.00.

3.      Venue in the Middle District of Florida is proper, pursuant to 28 U.S.C. § 1391 (a) – (d), because the principal address of one or more of the Defendants is in Lee County, Florida, which is within the Fort Myers Division of the District, and the subject action arises out of separate litigation involving the Defendants pending in this Court.

4.      Cincinnati is an insurance company organized under the laws of Ohio and authorized to transact insurance business in Florida, including the issuance of commercial general and umbrella liability insurance policies to insureds in Florida.  Cincinnati's principal place of business is located in Fairfield, Ohio.

5.      Defendant OMG, is a limited liability company organized and existing under the laws of Florida, with an address of 12998 S. Cleveland Avenue, Fort Myers, Florida 33907.

6.      The members of OMG are Ralph Garramone, 12998 S. Cleveland Avenue, Fort Myers, Florida 33907 and Wraith, LLC, 1231 W. Northern Lights Blvd., #911, Anchorage, Alaska 99503.

7.      Defendant Couture, upon information and belief, is a resident of Florida domiciled in Fort Myers, Lee County, Florida.

8.      Defendant Garramone , upon information and belief, is a resident of Florida domiciled in Fort Myers, Lee County, Florida.

9.      Defendant Noshirvan, upon information and belief, is a resident of Pennsylvania domiciled in Mansfield, Pennsylvania.

10.     Each defendant to this cause is a party needed for a just and complete adjudication of this controversy about the rights and duties under the policies described herein.

## FACTUAL BACKGROUND

11.     Cincinnati issued to OMG commercial general and umbrella liability insurance policies (ENP 057 39 47) that were in effect from March 22, 2020 to March 22, 2025 ("Cincinnati Policies").  Copies of the Cincinnati Policies are attached as Exhibit "A."

12.     OMG, Couture and Garramone are defendants to claims asserted by Noshirvan in a separate case pending in this Court, case no. 2:23-cv-01218-JES-DNF, captioned *Danesh Noshirvan, Plaintiff v. Jennifer Couture, et. al.* (the "Underlying Action").  A copy of the Third Amended Complaint ("TAC"), which was filed in the Underlying Action on July 10, 2025, is attached as Exhibit "B."

13.    The Underlying Action describes itself as a "civil conspiracy and agency action for defamation, tortious inference (sic), and intention (sic) infliction of emotional distress."  The claims asserted in the TAC include civil conspiracy to tortiously interfere with a business relationship; civil conspiracy to defame; civil conspiracy to intentionally inflict emotional distress; civil conspiracy to misappropriate likeness; and defamation.

14.    Noshirvan alleges that the defendants in the Underlying Action conspired with a nonparty (Joseph Camp) to defame, tortiously interfere, intentionally inflict emotional distress, and misappropriate likeness, with the conspiracy being described as malicious, vindictive, vengeful and "beyond all bounds of decency."  It is also alleged that the claim for civil conspiracy to defame involves false and defamatory statements that were maliciously published or caused to be published with knowledge that the defamatory statements were false and harmful.

15.    The Underlying Action also asserts that the defendants "had knowledge of, and agreed to participate, in a concerted effort to destroy Noshirvan and his family financially, reputationally, and to defame, deplatform, and terrorize Noshirvan by attempting to detract his child from his custody – as payback for making the initial Couture video."

4

16.     The relief demanded in the Underlying Action is "all actual damages, consequential damages, economic damages and non-economic damages, in excess of 5 million dollars including but not limited to compensation for injury to reputation, mental anguish, emotional distress, shame, depression, anxiety, sleep disturbance, loss of enjoyment of life, lost income and earnings, lost business opportunities, humiliation, loss of online platforms, out of pocket expenses, other non-economic damages, costs, interest, and punitive damages…."

## CINCINNATI POLICIES

17.     The Cincinnati Policies contain the following pertinent provisions:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

**SECTION I - COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.     Insuring Agreement**

a.     We will pay those sums that the insured becomes legally obligated to pay, as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

b.     This insurance applies to "bodily injury" and "property damage" only if:

(2)     The "bodily injury" or "property damage" occurs during the policy period; and

(3)     Prior to the "coverage term" in which "bodily injury" or "property damage" occurs, you did not know, per

5

Paragraph 1.d. below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part.

c.  "Bodily injury" or "property damage" which:

   (1)  Occurs during the "coverage term"; and

   (2)  Was not, prior to the "coverage term", known by you, per Paragraph 1.d. below, to have occurred;

d.  You will be deemed to know that "bodily injury" or "property damage" has occurred at the earliest time when any "authorized representative":

   (1)  Reports all, or any part, of the bodily injury" or "property damage" to us or any other insurer;

   (2)  Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

   (3)  First observes, or first observed, the "bodily injury" or "property damage";

   (4)  Becomes aware, or become aware, by any means other than as described in (3) above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

   (5)  Becomes aware, or become aware, of a condition from which "bodily injury" or "property damage" is substantially certain to occur.

## II. Exclusions

This insurance does not apply to:

**a.  Expected or intended injury**
Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force or protect persons or property.

o.    **Personal and Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement
   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.
   b. This insurance applies to "personal and advertising injury" only if:
      (1) The "personal and advertising injury" is caused by an offense arising out of your business; and
      (2) The "personal and advertising injury" offense was committed in the "coverage territory" during the policy period;
      (3) Prior to the "coverage term" in which the "personal and advertising injury" offense is committed, you did not know, per Paragraph **1.d.** below, that the offense had to be committed in whole or in part.
2. Exclusions
   This insurance does not apply to:

   a. **Knowing Violation of Rights of Another**
      "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

   b. **Material Published With Knowledge of Falsity**
      "Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

   c. **Material Published Prior To Policy Period**

      "Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

## SECTION V – DEFINITIONS

7.    "Bodily injury" means bodily injury, sickness or disease

7

sustained by a person, including death resulting from any of these at any time.

16.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

17.    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a.    False arrest, detention or imprisonment;

    b.    Malicious prosecution;

    c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    d.    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e.    Oral or written publication, in any manner, of material that violates a person's right of privacy;

    f.    The use of another's advertising idea in your "advertisement"; or

    g.    Infringing upon another's copyright, trade dress or slogan in your "advertisement".

### EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.s.** of **Section I - Coverage A - Bodily Injury and Property Damage Liability** is replaced by the following:

**2.  Exclusions**

This insurance does not apply to:

**s. Access or Disclosure of Confidential or Personal Information and Data-Related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of which is described in Paragraph **(1)** or **(2)** above. However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

**B.** The following is added to Paragraph **2. Exclusions** of **Section I - Coverage B – Personal and Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access or Disclosure of Confidential or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

## COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

Various provisions in this Coverage Part restrict this insurance. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

### SECTION I - COVERAGE

A.    **Insuring Agreement**

    1.    We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" arising out of an "occurrence" to which this insurance applies:

        a.    Which is in excess of the "underlying insurance"; or

        b.    Which is either excluded or not insured by "underlying insurance".

    2.    This insurance applies to "bodily injury", "personal and advertising injury" or "property damage" only if:

        a.    The "bodily injury", "personal and advertising injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

        b.    The "bodily injury" or "property damage" occurs during the policy period shown in the Declarations; or

        c.    The "personal and advertising injury" results from an "occurrence" that takes place during the policy period shown in the Declarations;

B.    **Exclusions**

This insurance does not apply to:

**2.    Breach of Contract, Failure to Perform, Wrong Description and Violation of Another's Rights**

"Personal and advertising injury":

**d.**    Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

### 13. Expected or Intended Injury

"Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually intended or expected.

However, this exclusion does not apply to:

a.    "Bodily injury" resulting from the  use of reasonable force to protect persons or property; or

b.    "Bodily injury" or "property damage" resulting from the use of reasonable force to prevent or eliminate danger in the operation of "autos" or watercraft.

### 14. Falsity, Prior Publication, Criminal Act and Media and Internet Type Businesses

"Personal and advertising injury":

**a.**    Arising out of oral or written publication of materials, if done by or at the direction of the insured with knowledge of its falsity;

**b.**    Arising out of oral or written publication of material whose first publication took place before the later of the following:

**(1)**    The inception of this Coverage Part; or

**(2)**    The "coverage term" in which insurance coverage is sought;

Arising out of a criminal act committed by or at the direction of the insured;

## DEFINITIONS

**4.**    "Bodily injury" means bodily harm or injury, sickness, disease, disability, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time.

**16.**    "Occurrence" means:

**a.**    An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage"; or

**b.**    An offense that results in "personal and advertising injury".

All damages arising from the same accident, continuous or repeated exposure to substantially the same general harmful conditions, act or offense shall be deemed to arise from one "occurrence" regardless of:

**(1)** The frequency of repetition;

**(2)** The number or kind of media used; or

**(3)** The number of claimants.

**17.**    "Personal and advertising injury" means injury, including "bodily injury", arising out of one or more of the following offenses:

**a.**    False arrest, detention or imprisonment;

**b.**    Malicious prosecution;

**c.**    Abuse of process;

**d.**    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**e.**    Defamation of character, including oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**f.**    Oral or written publication, in any manner, of material that violates a person's right of privacy;

**g.**    The use of another's advertising idea in your "advertisement";

**h.**    Infringing upon another's copyright, trade dress or slogan in your "advertisement"; or

**i.**    Discrimination, unless insurance coverage therefor is prohibited by law or statute.

### EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE

**SECTION I - COVERAGE, B. Exclusions** (and in the Professional Umbrella Liability Coverage Part and the Professional Umbrella Liability Coverage Part - Claims-Made only: Subparagraph **1.**) is modified to delete Exclusion **10. Electronic Data** in its entirety and replace it with the following:

This insurance does not apply to:

**10.    Access or Disclosure of Confidential or Personal Information and Data-Related Liability**

Any liability arising out of:

**a.**    Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**b.**    The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **a.** or **b.** above.

However, this exclusion does not apply:

**(1)** To damages because of "bodily injury", unless Paragraph **a.** above applies; and

**(2)** When such insurance is provided by valid and collectible "underlying insurance" listed in the Schedule of Underlying Insurance, or would have been provided by such listed underlying insurance" except for the exhaustion by payment of claims of its limits of insurance, and then only for such hazards for which coverage is provided by such "underlying insurance", unless otherwise excluded by this Coverage Part.

18.    Subject to a full and complete reservation of rights, Cincinnati has afforded a defense to Garramone, OMG, and Couture in the Underlying Action.

## COUNT I – DECLARATORY JUDGMENT – DUTY TO DEFEND

19.     The allegations contained in paragraphs 1 through 18, above, are realleged as if fully set forth herein.

20.     The Cincinnati Policies condition coverage for "bodily injury" on an "occurrence," which means an accident, and exclude bodily injury reasonably expected or intended by an insured.

21.     The Cincinnati Policies (CGL) exclude bodily injury arising out of a personal and advertising injury offense.

22.     Coverage for "personal and advertising injury" is limited to specified offenses and the Cincinnati Policies exclude personal and advertising injury caused by or at the direction of an insured with knowledge that the act would violate the rights of another and inflict personal and advertising injury; arising out of oral or written publication of material if done by or at the direction of an insured with knowledge of its falsity; or arising out of oral or written publication of material whose first publication took place before the policy period.

23.     A separate exclusion applies to an insured's liability arising out of any access to or disclosure of any person's confidential or personal information.

24.     The allegations in the Underlying Action, which govern Cincinnati's duty to defend, demonstrate the absence of coverage under the Cincinnati Policies.

25.     Because the allegations of the Underlying Action demonstrate the applicability of one or more exclusions for the claims asserted against OMG, Garramone and Couture, Cincinnati should be excused from any duty to defend them under the Cincinnati Policies.

26.     As a liability insurer's duty to defend under Florida law is broader than its duty to indemnify, a determination Cincinnati has no duty to defend necessarily means that there is also no duty to indemnify.

27.     A present controversy and dispute exists between Cincinnati and Defendants, including but not limited to Cincinnati's duty to defend the Underlying Action.

28.     The parties are entitled to a declaration of their rights and duties under the Cincinnati Policies.

WHEREFORE, Cincinnati requests the Court to enter a judgment determining that Cincinnati does not have an obligation to defend the Underlying Action, and to award any such other or further relief this Court considers appropriate.

## COUNT II – DECLARATORY JUDGMENT – DUTY TO INDEMNIFY

29.     The allegations contained in paragraphs 1 through 18, above, are realleged as if fully set forth herein.

30.     In the event the Court determines that a duty to defend exists, the actual facts demonstrate the applicability of one or more exclusions in the Cincinnati Policies to the claims asserted in the Underlying Action.

31.     The parties in the Underlying Action filed competing summary judgment motions that each contend there is no material issue of fact regarding liability.  Noshirvan's Motion for Partial Summary Judgment Regarding Liability, filed on September 30, 2025 (Doc. 516), contains the following statements:

- "From the outset, Couture – a close associate of Garramone – expressed a clear desire to harm Noshirvan and intent to retaliate" (Doc. 516, p. 2);

- "Couture felt Noshirvan had publicly exposed her; she was determined to strike back. …[T]his exchange shows Couture's intent to harm Noshirvan's reputation in retaliation, while actively discussing 'something we can do' about him.  These statements demonstrate the *mens rea* – a mindset bent on harming Noshirvan – which sets the stage for a conspiratorial effort to defame him" (Doc. 516, pp. 2-3);

- "Couture fixated on destroying Noshirvan's reputation as a form of vigilante justice…Couture's words reflect a personal vendetta and intent to inflict reputational harm" (Doc. 516, p. 3);

- And Couture with Garramone's permission, allowed [Joseph] Camp to reside at Central Park's Ranch to perform a covert online operations (sic) against Noshirvan's reputation (Doc. 516, p. 4);

- "These payments by Couture strongly indicate that Camp was hired as a third-party agent – in the conspiracy, tasked with digital dirty work (e.g., spreading defamatory content online and harassing Noshirvan)" (Doc. 516, p. 4);

- "After the Mansfield trip, Couture texted Garramone referring to Camp as 'that hacker' she hired, reinforcing that they saw him as a hacker-for-hire" (Doc. 516, p. 6);

- "They paid Camp for his expertise, met with him on OMG/GPS/Central Park Property to strategize, and had him disseminate defamatory content online" (Doc. 516, p. 7);

- "This is Garramone actively instructing on covert defamation tactics – namely, surreptitiously posting defamatory flyers about Noshirvan at night…Garramone denied sending the message, but the text evidence shows he did" (Doc. 516, p. 7);

- "The detailed instructions show a thought-out, coordinated strategy to blanket Noshirvan's neighborhood with defamatory flyers while evading identification.  …Garramone was undeniably part of this plan… Garramone's instructions were given to avoid federal mailbox laws and emphasize stealth.  …These communications illustrate an explicit agreement and coordinated effort to tarnish Noshirvan's reputation" (Doc. 516, p. 8);

- "Crucially, Couture notes 'now [Garramone's] excited,' explicitly indicating Garramone's active approval of Ratz's clandestine actions.  …These statements underscore Garramone's, Couture's, and GPS's active involvement." (Doc. 516, p. 9);

- "They knew their conduct was tortious.  …Garramone offered financial rewards to the GPS employees for their participation.  …Garramone's offer evidences Garramone's/GPS intent to provide logistical/financial support; enabling the defamatory campaign." (Doc. 516, p. 10);

- "Traveling across state lines, spying on Noshirvan, photographing private property and children, and blanketing his town with slanderous flyers – was not a rogue act, but done at the behest and direction of Couture and Garramone.  They acted as co-conspirators or agents carrying out the overt acts of defamation on the ground; Garramone and Couture managed the operation from behind the scenes."  (Doc. 516, pp. 10-11);

- "The unrebutted evidence shows that Garramone and GPS authorized Couture to use joint resources, which Couture then used to pay Trainor for a billboard and penny saver." (Doc. 516, p. 12);

- "The communications among the conspirators not only show planning but also after-the-fact admissions and cover-up strategies. …Defendants' acknowledged what they had done – with a tone of glee or justification – and plotted how to avoid accountability." (Doc. 516, p. 14);

- "The conspirators also discussed cover stories and denial tactics.  A telling excerpt:  Garramone suggested their 'stance' would be that the defamatory pictures/flyers were 'manufactured by people on the internet' and 'didn't come from us'" (Doc. 516, p. 15);

- "Camp at Couture's, Garramone's, and GPS's behest maliciously published false statements" (Doc. 516, p. 17);

- "Garramone (the principal of GPS, Central Park, and OMG) funded and encouraged the scheme, and housed the participants while Couture Camp, and others actively plotted execution – showing a shared intent and agreement to target Noshirvan" (Doc. 516, p. 19);

- The "object of the agreement was unequivocally unlawful and tortious:  Defendants agreed to defame and inflict emotional distress upon Noshirvan (through threats, stalking, and other outrageous conduct) (Doc. 516, p. 20);

- The defamatory statements were "invented as part of Defendants' campaign to 'take down' Noshirvan." (Doc. 516, p. 21);

- The "undisputed evidence shows Defendants acted intentionally in orchestrating a campaign to cause severe distress….This was no accident.  Defendants openly declared their aim to make Noshirvan 'suffer,' to 'break him, - evincing a deliberate desire to inflict harm' (Doc. 516, p. 23); and

- "Defendants engaged in a ruthless vendetta involving vile threats of death, rape, and coercion to commit suicide; a menacing behavior that cannot be tolerated" (Doc. 516, pp. 23-4).

32.    The Cincinnati Policies exclude personal and advertising injury caused by or at the direction of an insured with knowledge that the act would violate the rights of another and inflict personal and advertising injury; arising out of oral or written publication or material, if done by or at the direction of an insured with knowledge of its falsity; and arising out of oral or written publication, in any manner, of material, whose first publication took place before the beginning of the policy period.

33.    The allegedly undisputed facts and statements in Noshirvan's Motion for Partial Summary Judgment establish that there is no duty to indemnify under the Cincinnati Policies for the claims asserted by Noshirvan in the Underlying Action.

34.    The Cincinnati Policies remove coverage for bodily injury and personal and advertising injury that an insured or any employee authorized by an insured to receive notice of an offense or claim, had knowledge that an offense had been committed or had begun to be committed, in whole or in part, before the policy period, and any continuation, change or resumption of such personal and advertising injury during or after the policy period is deemed to have been known prior to the coverage term.

35.     Noshirvan asserts in the Underlying Action that the offenses about which he complains occurred from 2022 to 2024 and were a continuous campaign conducted or perpetuated against Noshirvan.

36.     The Cincinnati Policies exclude bodily injury and personal and advertising injury where an insured has knowledge that the bodily injury or personal and advertising injury had occurred or begun to occur or be committed in whole or in part.

37.     The circumstances giving rise to the claims asserted in the Underlying Action were actually or reasonably known to OMG, Couture and Garramone during the initial policy period of the Cincinnati Policies and before any renewal of the Cincinnati Policies.

38.     A present controversy and dispute exists between the parties regarding Cincinnati's duty to indemnify under the Cincinnati Policies, and the parties are entitled to a declaration of their rights and duties under the Cincinnati Policies regarding any duty to indemnify for the claims asserted in the Underlying Action.

WHEREFORE, Cincinnati requests the Court to enter a judgment determining that Cincinnati does not have an obligation to indemnify for the claims asserted in the Underlying Action, and to award such other or further relief this Court considers appropriate.

## COUNT III – DECLARATORY JUDGMENT – APPLICABLE LIMITS OF COVERAGE

39.     The allegations contained in paragraphs 1 through 18, above, are realleged as if fully set forth herein.

40.     In the event the Court determines that a duty to defend and indemnify for the claims asserted in the Underlying Action exists, Cincinnati requests that the Court decide the applicable limits of coverage under the Cincinnati Policies.

41.     The Commercial General Liability Coverage Part Declarations for each policy has Limits of Insurance of $1 million for Personal & Advertising Injury for "any one person or organization."

42.     The Limits of Insurance (Section III) provides in part that the "Personal and Advertising Injury Limit is the most we will pay under **COVERAGE B.  PERSONAL AND ADVERTISING INJURY LIABILITY** for the sum of all damages because of all 'personal and advertising injury' sustained by any one person or organization."

43.     As Noshirvan is the sole plaintiff in the Underlying Action, the applicable limit of coverage under the commercial general liability policy, which excludes bodily injury arising out of personal and advertising injury, is $1,000,000.00, regardless of the number of offenses allegedly committed during the policy period.

21

44.    The Commercial Umbrella Liability Coverage Part Declarations states Limits of Insurance of $1,000,000.00 each occurrence/aggregate, with a personal and advertising injury limit of $1,000,000.00 for "Any One Person or Organization."

45.    As Noshirvan is the only person asserting claims in the Underlying Action, the applicable limit of coverage under the commercial umbrella liability policy is $1,000,000.00, regardless of the number of offenses allegedly committed during the policy period, even assuming that such coverage is available at all.

46.    The combined limit of coverage for a single policy period is the maximum amount of coverage (if available at all) because an insured's knowledge of bodily injury or personal and advertising injury that had occurred or begun to occur or be committed precludes coverage under subsequent policy periods as a known loss or loss in progress.

47.    The combined aggregate limits of coverage under the Cincinnati Policies for the claims asserted by Noshirvan in the Underlying Action is $2,000,000.00 dollars, even assuming that such coverage is available at all.

48.    A present controversy and dispute exists between the parties regarding the applicable limit of available coverage, if any, under the Cincinnati Policies for the claims asserted by Noshirvan in the Underlying Action, and the parties are entitled to a declaration of their rights and duties under the Cincinnati

Policies regarding the applicable coverage limits should the Court decide that there is any available coverage.

WHEREFORE, Cincinnati requests the Court to enter a judgment determining that the aggregate limits of coverage available for the claims asserted in the Underlying Action, in the event the Court decides that coverage exists in the first instance, is $2,000,000.00, and for any other or further relief this Court considers appropriate.

Dated: February 27, 2026

Respectfully submitted,
DGH LEGAL, PLLC
Attorneys for Plaintiff
1333 S.E. 25th Loop, Suite 101
Ocala, Florida 34471
(352) 732-2255 - phone
(352) 351-0166 - fax

By: s/s *David A. Glenny*
David A. Glenny
Florida Bar No: 371807
Robert H. McLean
Florida Bar No: 0098094
glenny@dghlegal.com
mclean@dghlegal.com
*Attorneys for Plaintiff The Cincinnati Indemnity Company*